## ATLANTIC COAST LINE R. CO. v. COLEMAN.

### No. 12788.

United States Court of Appeals
Fifth Circuit.

April 28, 1950.

---

6. See Miller v. U. S., 317 U.S. 369, 373, 374, 63 S.Ct. 276, 87 L.Ed. 336, 14 A.L.R. 55, and citations.

Clyde W. Atkinson, Tallahassee, Fla., H. Y. Reynolds, Quincy, Fla., for appellee.

Before HUTCHESON, Chief Judge, and WALLER and RUSSELL, Circuit Judges.

HUTCHESON, Chief Judge.

Brought under the Federal Employers' Liability Act,[1] the suit was for damages for personal injuries received in a fall from a railroad trestle or bridge as a result of claimed negligence of the defendant in sending plaintiff to work thereon.

As plaintiff pleaded it,[2] the negligence consisted in this: that, though he had had thirty-seven years railroad experience as a member of a section crew, twenty-five years of that time as section foreman, he was not experienced in working on railroad bridges or trestles; that, notwithstanding defendant knew this was so, it ordered him to go upon one with his gang to supervise its repairing and building; that the work was unsafe and hazardous, was outside the ordinary duties of his employment, and he was not fully aware of its danger.

Defendant, denying that it was guilty of negligence as alleged, the cause was tried to a jury, and at the conclusion of all the evidence,[3] none of which contradicted or differed in any substantial respect from that

Charles Cook Howell, Jr., Jacksonville, Fla., Wm. M. Howell, Jacksonville, Fla., Charles Cook Howell, Wilmington, N. C., for appellant.

1. Title 45 U.S.C.A. "Railroads", § 51 et seq.

2. That on said date of June 28, 1945, the plaintiff was employed by the defendant as railroad section foreman and his average earnings from said employment were at least $260.00 per month, and he had been so employed by the defendant for more than 25 years prior to said date, but plaintiff was not experienced in the more hazardous occupation of building and repairing railroad bridges and trestles; notwithstanding, the defendant, by and through its agent the defendant's roadmaster or trackman and plaintiff's immediate superior in line of employment, ordered and commanded this plaintiff, over his protest, to go upon said premises which were then and there an unsafe place upon which to work, and to repair and rebuild and supervise the repairing and rebuilding of said bridge, which work was unsafe and such that he was not accustomed to and outside the ordinary duties of his employment, and while so engaged in such hazardous and unsafe task to which he was unaccustomed and which was outside the ordinary duties of his employment, this plaintiff became overbalanced and lost his footing and fell a great distance, to-wit, sixteen feet, thereby breaking his leg at the ankle, causing him great pain and suffering and rendering him permanently crippled and disabled.

3. As to how he came to work on the bridge, plaintiff testified that the bridge foreman, who was to supervise the repairs on the bridge, didn't have any labor, and Mr. Guy, the roadmaster asked plaintiff to take his gang and go up there with him and make the repairs. "I told him I wasn't any bridge man, that I was section foreman". "Mr. Guy said, 'You could do it. Go ahead and do it.' And I did."

He further testified that, under the general supervision of the bridge foreman, he supervised the work being done by his own crew.

given by plaintiff, defendant moved for a directed verdict.

This motion denied, and a verdict for plaintiff coming in, defendant moved, under Rule 50, Federal Rules of Civil Procedure, 28 U.S.C.A., for a judgment notwithstanding the verdict. This motion also denied, it appealed from the judgment on the ver-

This is his testimony as to how the accident occurred: "Well, after we had been out there working on the bridge since we began Monday, if I remember right, and this happened on Thursday, the 28th day of June, we were putting timbers in the bridge and taking out the old cords, some call it 'stringers', and caps, ties, and we taken all the timbers out and put them back, what was to go in, and we were bolting the trestle together when I had my accident. I was showing an old darkey that I had there how to put a bolt through the cord, it was a three-ply cord, and the bolt goes through that, holding them in place, and I was showing him how to put the bolt through and divide it between it, and I just lost my balance, and I was squatting down in the track and raised up to step over on the other side to show him how to put the bolt through, and as I raised up I lost my balance and over I went."

As to his regular work and his knowledge of bridges and trestles and repairs made on them, plaintiff testified that it was his duty to maintain the tracks, exclusive of those on bridges and trestles, to put in cross ties, take out the rotten ones, put in new ones and keep the track levelled and surfaced up. It was his duty, too, to inspect and to report defects of bridges and sometimes to have his gang make temporary repairs on them, and it was the section crews' duty to keep the bolts hardened and tightened across the trestles and his to supervise their work.

He testified: that he walked across bridges and trestles many times and inspected the work of his crew, showing them how the work was to be done and supervising it, and he had supervised the work of tightening bolts and nuts on open top bridges just as high and long as the one from which he fell; both in Georgia and in Florida; that he had done or supervised this kind of work during the 37 years that he had been employed by the railroad; that on the occasion of his injury he was showing one of his laborers how to put in a bolt, a bridge bolt, that on this occasion he was supervising his labor to assist Mr. Rowell, the bridge foreman, and he had not been asked to do any of the physical work; that during the 37 years he had been a regular worker he had made steady time and his eyesight was good.

As to the guard rail, which was not on the bridge at the time he fell, he testified; that its function was to hold the cross ties in place to keep them from swishing about when the train went over the track, and that it is a size of timber 6x8, framed down to about 2″ above the ties, a notch cut in it; that it stands about 2″ above the ties; that the first thing they did out there was to remove the guard rail because they had to take the guard rail out to remove the cross ties and on the three or four days he had been working before the accident, he had been working without the guard rails, and that he had made no complaint about the guard rail not being there, or about his work.

"It was necessary for me to see where the man put the bolt through, and this was about 14 inches below the level of the cross ties, and I had to get down to where I could look under the bridge to do it. I squatted down to show him."

"Q. How was it you became overbalanced and lost your footing, Mr. Coleman? A. That's beyond my knowledge. I have no idea. There was nothing around the trestle or bridge that I stumbled over. I just raised up to show him, raised up out of balance, and kept falling until I hit ground. My foot didn't strike anything. There was nothing unusual about the cross-ties. I had no idea what made me lose balance, nobody pushed me. I had nothing in my hands, nothing was the matter with my foot. I just slipped between the opening between the ties.

"Q. The opening was the customary one, wasn't it? A. Yes.

"Q. No wider than on any other similar bridges? A. No. There was nothing slick or slippery on the trestle. It wasn't raining. It was dry. My foot didn't slip or skid.

"Q. Of course you had good eye sight? A. Good as I got now.

"Q. You knew, Mr. Coleman, that if you toppled over or fell off the bridge, you might get hurt? A. Certainly, I knew that.

"Q. Mr. Coleman, you have spoken in your declaration about not being fully aware of the dangers of the work you were doing. What was there about it that you were not fully aware of? A. I didn't know anything about building bridges, cutting timbers, whatever it

dict, assigning as error the denial of these motions.

Here, setting out fully in its brief, the undisputed facts and insisting that they do not, they cannot, be said to support the charge of negligence made against it, appellant urges upon us that the judgment must be reversed and here rendered for it.

Appellee, quoting none of the evidence, but setting out instead a purported summary of its effect, presents the case here as though appellee was put at a task made dangerous by the negligence of the defendant without being adequately advised of its dangers or provided with proper safeguards against them.

As an example of the discrepancies between the summary and the evidence itself, appellee states in his brief, "Plaintiff was sent on the job by defendant's road master over his protest, plaintiff realizing that the task was dangerous and not voluntarily assuming such duties."

The evidence of plaintiff, however, as set out in the note above, shows that he did not object to undertaking the work because of its dangers but because he thought he might not have the skill to do it properly, and when told that he could do it and to go ahead, he made no further objection. His evidence shows, too, that there was no danger whatever in doing the work except the danger of falling, if he did not keep his balance, a danger not due to any negligent condition but merely to the fact that the trestle was 16 feet high, and if he slipped through or fell off the ties he would fall to the bottom. It shows, too, that a part of his duties for the thirty-seven years he had been a section man, twenty-five of them as foreman, was to keep constant watch and ward over this and other trestles, that he was walking and riding over them regularly, in the course of his duties, to find and report defects in them, he and his crew keeping the track over them in repair and sometimes making temporary repairs on the trestles, and that no one knew better than he, from long experience in crossing trestles, that if he did not keep his balance, and did not watch his step, he might fall through or off the trestle.

Again appellee's brief, on the same page, comments upon the fact that the guard rail, which was placed on the ties to hold them steady, had been taken off, and there was nothing provided for plaintiff's safety or to prevent him from falling.

The evidence of plaintiff himself shows conclusively that the so-called guard rail was not intended to, it did not, it could not, act as a safety measure to keep men working on the bridge from falling. It was put in to keep the ties from separating and being pushed out of line by passing trains. The first thing that had to be done in repairing the trestle, as plaintiff himself testified, was to take the guard rails off.

None of the cases cited by appellee are in point. They deal with situations where there is conflicting evidence, or where the evidence shows a dangerous situation resulting from want of care. Nothing was out of place here. Nothing was other than as it ought to be. On the contrary, everything was as it ought to be in working on and bringing the repair job to completion. The charge or claim that defendant did anything that it ought not to have done or left anything undone that it ought to have done, finds no support in the evidence.

As plaintiff himself frankly testified, there was nothing that could have been told him that he did not already know, and no harm would have come to him if he had not lost his balance. The fact, which appellee does not plead, but of which he seeks to make something here, that plaintiff was sixty-three years old, is entirely without significance. As a matter of common knowledge, there is nothing in the mere fact that an active able bodied man, accustomed for years to walking over, working in connection with, and inspecting trestles, is sixty-three years old to make him more likely to fall off or through the trestle than a man of

takes to build bridges. No experience in it.

"I didn't fall because of dizziness or slip during those operations. The cross ties were level and stationary and I didn't feel them give or sway."

lesser years. Indeed, with the caution and prudence that comes with years and experience, he is less likely to do so. Too many difficulties and impediments are already being placed unjustly in the way of competent and skilled older men to keep them from getting and holding jobs, for this court to add to them the view that the mere fact that an employee had attained the age of sixty-three made it an act of negligence to set him to doing what he was doing here.

The evidence in this case is so without dispute, the situation it portrays is so clear, simple and free from any suggestion of negligence or fault on the part of the defendant proximately causing or contributing to plaintiff's injury as to make the citation of authorities unnecessary. In emphasis, however, of the correctness of this view, we have set out in the note below citations of, and quotations from a few of the leading cases.[4]

The judgment is reversed and here rendered for appellant.

RUSSELL, Circuit Judge (dissenting). Respectfully dissenting, I merely outline the reasons why I cannot concur. In the trial of this case issues of fact were presented: Whether the plaintiff had formerly supervised temporary, as distinguished from permanent or major, repairs of trestles, and if so, the extent of experience; whether the repairs in question were temporary or major; whether the repairs in question were such as were ordinarily required to be performed by a section foreman in the general performance of his employment, or even contemplated by the rules of the defendant; whether section foremen in the customary discharge of their regular duties are required to do more than walk across and supervise maintenance and repair of the track top of the trestle; whether in consideration of all of the circumstances the employee was directed to work in a place that was not, as to him, safe. (Whatever may be its materiality, I conclude from the evidence, contrary to the majority, that the plaintiff undertook the work under protest and compulsion of superior authority. In any event, there was a question for the jury as to this.) It is not disputed that the work of a bridge foreman is more hazardous than that of a section foreman, and that generally before employees are made bridge foremen they must have had a year or two years experience on bridge gangs. The bridge foreman and section foreman are considered in different employment classifications by the defendant. A section foreman, even with more years service, can not "roll" a bridge foreman. The question in this case can not be solved completely by determining alone the extent of the former experience of the section fore-

---

4. "The (Federal Employers' Liability) Act does not make the employer the insurer of the safety of his employees while they are on duty." "The basis of his liability is his negligence, not the fact that injuries occur." Ellis v. Union Pacific, 329 U.S. 649, 67 S.Ct. 598, 600, 91 L.Ed. 572.

"The weight of the evidence under the Employers' Liability Act must be more than a scintilla before the case may be properly left to the discretion of the trier of fact—in this case, the jury." Brady v. Southern R. Co., 320 U.S. 476, 64 S.Ct. 232, 88 L.Ed. 239.

"The rule as to when a directed verdict is proper, heretofore referred to, is applicable to questions of proximate cause." Id. 320 U.S. at page 483, 64 S.Ct. at page 236.

"The definition of negligence under the Employers' Liability Act as stated by the Supreme Court differs in no wise from its definition under the general law, except possibly for added emphasis upon the accepted corollary that the standard of care must be commensurate with the dangers of the business." Eckenrode v. Pennsylvania R. Co., D.C., 71 F.Supp. 764, 767.

"It is still the duty of the Court to determine whether the plaintiff has produced any evidence of negligence on the part of the defendant and, if not, to direct a verdict". Id. 71 F.Supp. at page 766, affirmed 3 Cir., 164 F.2d 996, certiorari denied 335 U.S. 329, 69 S.Ct. 91, 93 L.Ed. 64.

"So long as the law is that the defendant must be negligent for the plaintiff to recover for his injuries it is our responsibility to apply the negligence test honestly and not to pretend that there is negligence when it does not exist." Eckenrode v. Penn. R. Co., 3 Cir., 164 F.2d 996, 1000.

man, or whether he exercised proper care to avoid falling from the trestle after he began working in the capacity of a bridge foreman. These solutions might present no more than contributory negligence, not at all fatal in this action under the Federal Employers' Liability Act. The real question is whether a determination of all the factual issues in accord with plaintiff's contentions, together with the unquestioned facts, would in law authorize a jury to find that the defendant's conduct failed to meet the standard of ordinary care. Thus, to find that an ordinarily prudent person, with the knowledge and authority of the defendant's agent, would not have ordered this section foreman out on the trestle to assume the duties of a bridge foreman. I think so. This fact the jury found, as evidenced by the verdict returned. The judgment should be affirmed.[1]

1. Bailey v. Central Vermont Ry., 319 U.S. 350, 63 S.Ct. 1062, 87 L.Ed. 1444.